KNEISLEY LUMBER COMPANY, Appellant, v. EDWARD B. STODDARD COMPANY et al., Respondents.

St. Louis Court of Appeals, March 31, 1908.

1. BUILDING CONTRACT: Bond of Contractor: Changes in Contract. Where a contractor in the construction of a building departed from the specifications of his contract with the assent of his bondsmen, such bondsmen were not discharged by reason of the departure.

2. ———: ———: Consideration for Bond. Where a bond given by a contractor for the proper performance of his building contract was executed by the bondsmen after the execution of the contract but with the understanding that the contract was not to become effective until the bond was executed, and both contract and bond were delivered at the same time, the bond was a part of the contract and the contract was a sufficient consideration for the bond, so as to render the bondsmen liable thereon. Where such bond provided that the building should be kept free of mechanics' liens, the bondsmen could not enforce a lien against the building, for materials which they furnished, after the original contractor had been paid in full.

3. ———: ———: Partnership: Authority of Partner. The power of a partner to bind his copartners is limited to the objects and ordinary necessities of the firm. The signing of a builder's bond is not one of the objects of a partnership engaged in the lumber business, so that the signing of a builder's bond by a member of such firm would not bind the other partners.

4. ———: ———: ———: ———: Dormant Partner. But where three partners were engaged in the lumber business, one of them being a dormant partner and the other two active partners, and one of the two active partners signed the firm name to a builder's bond with the consent of the other active partner, this did not bind the silent partner as between themselves, but it would bind all the members of the partnership as against the party to whom the bond was given to secure the performance of the builders' contract.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville*, Judge.

AFFIRMED.

*George Hubbert* for appellants.

(1) The uniform holding in Missouri is that any change in the terms of a building contract, even in the course of its execution, without the surety's consent, releases his obligation under the builder's bond. Beers v. Wolf, 116 Mo. 179; Heim Brewing Co. v. Hazen, 55 Mo. App. 277; Taylor v. Jetmore, 23 Mo. 244; Ryan v. Morton, 65 Texas 262; Bragg v. Shain, 49 Cal. 131; Kane v. Thuener, 62 Mo. App. 69; Timmerberg v. Schramm, 71 Mo. App. 87; Killoren v. Meehan, 55 Mo. App. 427; Eldridge v. Fahr, 59 Mo. App. 44; Fullerton v. Gates, 89 Mo. App. 201. (2) Generally, the courts are strict in ruling that variation in the terms or conditions of payment as provided in the contract are fatal —that payments must be made as and when stated in the contract only; otherwise the surety is discharged. Gato v. Warrington, 19 So. 883; Bachus v. Archer, 67 N. W. 913; Evans v. Graden, 28 S. W. 439, 125 Mo. 72; St. Mary's College v. Meager, 11 S. W. 608. (3) Harve Kneisley had no authority, as partner in the

lumber business to sign the firm name as surety for Stoddard Company to the builder's bond. Bentzen v. Zierlien, 4 Mo. 417; Gwinn v. Rooker, 24 Mo. 290; Henry County v. Gates, 26 Mo. 315; Bank v. Schaumburg, 38 Mo. 237. (4) A partner's powers are limited to the objects and ordinary necessities of such partnerships, on the principle of agency. George on Part., pp. 215, 235, 236; Brandt on Guar. and Sur., sec. 10; 24 Am. and Eng. Enc. L., p. 726; Bullard v. DeGroff (Neb.), 82 N. W. 4; George, Part., sec. 93, p. 215; Bowman v. Heating Co., 80 Mo. App. 335. (5) But there certainly can be no counter claim or set-off maintained by defendants where the liability to defendants exist as against any fewer than the whole copartnership firm. Then—Mrs. E. L. Kneisley is not a party to the bond. The bond, at most, is not the bond of the copartnership. Then, in a suit for a debt due to a firm, as in this case, a debt due from one or more of the defendants, individually, is not the subject of counterclaim of set-off. Payne v. Oshea, 84 Mo. 129; Lamb v. Brolaski, 38 Mo. 51; Weil v. Jones, 70 Mo. 560.

*C. H. Montgomery* and *Frank Farlow* for respondents.

(1) The contract and bond are one and the same instrument. They were both on the same sheet of paper, they were executed at the same time, and in regard to the same transaction, and the contract itself required the giving of such bond within ten days in the following language. Ramlose v. Surety Co., 100 Mo. App. 365; Lumber Co. v. Calhoun, 89 Mo. App. 209. (2) It thus clearly appearing that the bond and contract are one and the same instrument, the appellants cannot adopt the part beneficial to them, and repudiate the part which is not to their interest. They must adopt the whole contract, or repudiate the whole.

Dry Goods Co. v. Bank, 81 Mo. App. 46; McLahlin. v. Barker, 64 Mo. App. 525; Mechem's Agency, sec. 148; Fahy v. Grocery Co., 57 Mo. App. 73; Nelson v. Hirsh, 102 Mo. App. 513; Bank v. Hughlett, 84 Mo. App. 270; 2 Morawetz on Private Corporations, sec. 629.     (3) Harve C. Kneisley was entrusted with absolute author- ity in the management of the business of the company. Bank v. Hughlett, 84 Mo. App. 268; Hayner v. Crow, 79 Mo. 296; McAlister v. Barnes, 35 Mo. App. 669. (4) The evidence shows, and the court found that there were no changes in the work or plans and specifications. Leavel v. Porter, 52 Mo. App. 641. (5) Bondsmen to indemnify against liens, cannot themselves maintain a lien. Handley v. Ward, 70 Mo. App. 148; Deitz v. Leete, 28 Mo. App. 540.

BLAND, P. J.—In 1900 plaintiffs were copartners engaged in the retail lumber business, in the city of Neosho, Mo., under the firm name of the Kneisley Lum- ber Company. Defendants Edward B. Stoddard and J. P. Hayward were partners under the firm name of the Edward B. Stoddard Company. Defendants G. F. C. Corl and Charles H. Murray were partners in the ice business. Defendant Murray has departed this life since the appeal was perfected and the suit has been revived in the name of his administratrix, who has en- tered her voluntary appearance. Corl and Murray had plans and specifications prepared by James Robinson, an architect, for a plant for the manufacture of arti- ficial ice, to be erected in the city of Neosho, and ad- vertised for sealed bids for the erection of said plant. The bids were received and opened on April 7, 1900. The Stoddard Company being the lowest bidder at $4,410.50, the contract was awarded to that firm. The Kneisley Lumber Company, under contract with the Stoddard Company, furnished $1,468.98 worth of lum- ber, which went into the construction of the building.

The Stoddard Company failed to pay for the lumber, and the Kneisley Lumber Company filed a mechanics' lien upon the ice plant and the land upon which it is situated. The petition asks for a personal judgment against Stoddard and Hawyard and to foreclose and enforce plaintiffs' mechanics' lien against the ice plant. The venue of the cause was changed to the Greene Circuit Court. Stoddard was never served with process of summons and made no appearance. At the January term, 1907, of the Greene Circuit Court, the issues were submitted to the judge of the court sitting as a jury, who, after hearing the evidence, found for plaintiffs against Hawyard and rendered judgment against him for $1,468.98 principal and $566 interest, found the issues in favor of Corl and Murray, and that plaintiffs were not entitled to enforce their lien against the ice plant. Plaintiffs appealed from the judgment denying them a foreclosure of the lien. The building contract between Corl and Murray and the Stoddard Company was in writing. It contains the following provisions bearing upon and relevant to the questions in dispute:

"And the second parties, for and in consideration of the first parties, completely and faithfully executing the aforesaid work and furnishing all materials therefor, so as fully to carry out this contract, and the design according to its true spirit, meaning and intent and by and at the times mentioned, and to the full and complete satisfaction of James B. Robinson, superintendent, do hereby agree to pay to said parties the sum of four thousand four hundred and ten and 50-100 ($4,410.50) dollars, lawful money of the United States on certificates of superintendent from time to time as work progresses, to-wit, seventy-five per cent of the estimated value of the same, subject to the additions and reductions as hereinafter provided.

"Estimates to be made on the first and fifteenth days of each month by the superintendent of value of

labor and materials furnished by contractor and payments made on the basis of these estimates, and the remainder on the satisfactory completion and acceptance of the entire work after the expiration of five days.

"It is agreed by the parties that twenty-five per cent of the contract price shall be held by the owner as security for the faithful completion of the work and may be applied under the direction of the superintendent in the liquidation of any damages under this contract, also furnishing to the owners a release from any liens or right of lien by bond herewith annexed within ten days from above date or if requested a sworn statement as required by law before commencing work on this contract.   .   .   .   .

"It is also further agreed that the said parties of the second part may make all alterations by adding, omitting, or deviating from the aforesaid plans, drawings or specifications or either of them which they may deem proper and the said architect shall advise, without impairing the validity of this contract, and in all such cases the architect shall value or appraise such alterations and add or deduct from the amount herein agreed to be paid to the said first parties the excess or deficiency occasioned by such alteration."

Corl and Murray exacted a bond of the Stoddard Company for the faithful performance of the contract. This bond was furnished and signed by the Kneisley Lumber Company as surety. One of the conditions of the bond is that the Stoddard Company "shall duly and promptly pay and discharge all indebtedness that may be incurred by the said Edward B. Stoddard Company in carrying out the said contract, and complete the same, free of all mechanics' liens."

The evidence for plaintiffs show that James Robinson, the architect, did not superintend the erection of the building and at no time gave an estimate of the value of material furnished or work done, nor did he

Lumber Co. v. Edward B. Stoddard Co.

advise any changes or deviations from the original plans and specifications. Robinson's evidence is that he had nothing to do with the building and did not go about it after the contract was let. Defendants' evidence tends to show that Robinson was a partner in a lumber company at Neosho, which was a business rival of plaintiffs' company, and that Harve Kneisley, one of the plaintiffs, not only advised that Robinson should not be permitted to superintend the building, or make estimates, but insisted that he not be allowed to do so, and requested that Corl himself superintend the building, and Corl supervised the building as requested by Kneisley. The evidence shows that alterations and additions, amounting to $86.10 over and above the contract price were made. E. G. Carter, who had charge of the construction work for the Stoddard Company, testified that it was found desirable to make changes and they were made as the work progressed, by omitting some things called for by the specifications and by adding other things not in the specifications; that Hawyard sometimes gave orders for changes but they were usually given by Corl; that the prices for alterations were not fixed beforehand, so far as he knew; that no one, as superintendent or architect, had anything to do with the changes, which were wholly a matter of request on the part of Corl and, as he understood, were agreed on beforehand between Corl and Stoddard. Witness further testified as follows: "I recall that there was a concrete and stone foundation put under a column in the engine room; also a chute to carry ice from the storage room into the cars; that there were also changes made in the sewers, some changed in positions and more sewers put in than the original plans called for and there were other changes which I do not recall. The value or cost of these changes I do not recall. I made no estimates before any changes or additions in or to the original contract plans, but my estimates were made after

the work was done, that is, I kept account of the material used and the labor employed, as the change progressed, and gave this account to Mr. Corl and Mr. Stoddard after the contract was finished.    I was not there when the settlement was made between Mr. Corl and Mr. Stoddard. I asked Mr. Corl during the progress of the work, if Mr. Stoddard was paying the Kneisley Lumber Company for material as Stoddard got his payments.    He said 'that he did not know or care, as he was not responsible for the payment of material furnished by the Kneisley Lumber Company, as they, Kneisleys, were on Stoddard's bond.' "    Corl testified that estimates of the cost of all additions were made and the cost agreed upon before they were made.

The Stoddard Company had another building contract on hand at the time the company was erecting the ice plant.  Stoddard's headquarters were at Joplin, Missouri.   Corl testified that about the last of April he notified plaintiffs that Stoddard was coming to Neosho the first of May and he (Corl) would pay Stoddard $2,000, and advised Harve Kneisley to get an order for $1,000 from Stoddard before the money should be paid over, or to be present when it was paid so that he might get $1,000 of the payment.   Kneisley did not get the order nor was he present when the money was paid, but told Corl to go ahead and pay the money to Stoddard, that Stoddard was worth $10,000 and he would get his money anyway.   Harve Kneisley denied having any such conversation with Corl, and testified he knew nothing of the payment of the $2,000 until some time after the money was paid over.   The $2,000 was paid to Stoddard on May fourth and on the same day he gave plaintiffs a check on a Joplin bank for $500, which plaintiffs applied as a credit on a lumber account for lumber furnished the Stoddard  Company for another building. This credit Stoddard afterwards ratified.   Harve and Harry Kneisley are the sons of Mrs. E. L. Kneisley. The

evidence shows that the Kneisley Lumber Company was, prior to his death, the property and business of the father of the boys and the husband of Mrs. E. L. Kneisley. After his death it was agreed between plaintiffs that they would continue the business as co-partners, under the old firm name of the Kneisley Lumber Company. The two boys lived with their mother and were the sole managers of the business. The mother took no part whatever in its management and was not consulted as to its management by her sons. There is no evidence to show that any advertisement of the firm's business disclosed who were its members, and the evidence tends to show that it was not generally known that Mrs. Kneisley was a member of the firm, and that neither Corl or Murray knew she was a member. The evidence also shows that Harve Kneisley brought Stoddard to Neosho to bid on the erection of the ice plant, and that before Stoddard made the bid he and the Kneisleys agreed that if Stoddard should be awarded the contract the Kneisley Lumber Company should have the contract to furnish the lumber, at prices agreed upon at the time. The evidence also shows that Stoddard looked to the Kneisley firm to furnish security on his builders bond and that Harve Kneisley agreed with him to get security on said bond. Without consulting either of his partners, and without their knowledge or consent Harve Kneisley signed the firm name to the bond as surety. Harry Kneisley, after being informed of the fact, approved and ratified the act. But there is no evidence showing that Mrs. Kneisley, the other partner, was informed of the fact or ever ratified the act. The evidence also shows that this bond was the first and only one of any kind to which the firm's name was signed as surety. Defendants introduced some evidence tending to show that it is the common custom of lumber companies to sign the bonds of contractors, where

the lumber company has a contract with the builder to furnish lumber for a building. The evidence, however, is not sufficient to prove the existence of such a custom at Neosho, or elsewhere. The evidence shows that Corl and Murray paid the Stoddard Company in full and that all subcontractors for labor or material were paid in full, except plaintiffs; and that on May fourth, Corl and Murray paid the Stoddard Company $2,000 on their building contract,—$500 on May ninth; $500 on May nineteenth; $500 on June second; $500 on June ninth; $48.05 on May twelfth for concrete work; $4.05 May eighteenth for freight, and on June twenty-sixth paid $444.50 to subcontractors. Plaintiffs' evidence does not show or tend to show whether or not these payments were made in compliance with the terms of the contract, and there is no evidence showing that any of the partial payments made as the work progressed were in excess of seventy-five per cent of the material on hand and work done at the time such payments were made.

The learned circuit judge made the following findings of facts:

"I find as a fact that the plaintiff, the Kneisley Lumber Company, furnished the items of lumber set out in its lien claim to one Stoddard for the purpose of completing an ice plant, as alleged in the petition; that the last item thereof was furnished on or about June eighth, and the lien papers having been filed on October sixth, and the suit begun on October seventeenth, were all in due time in reference to those particulars. That is one thing I want to make plain.

"I find that Harve Kneisley, one of the plaintiffs, and his brother Harry Kneisley, and their mother, were all jointly interested in the lumber business, under the firm name of the Kneisley Lumber Company, but that Harve and Harry were the sole administrative agents of said partnership, using their judgment for the judgment and skill of the partnership, without consultation

as to any matters connected with the partnership with their mother except as mere conversations in the family circle, without any idea or thought of having her judgment or opinion on the conduct of the business.

"I hold that in this case the evidence shows such authority in them, or jointly, as to warrant them in any negotiations to further the interests of the business where such conduct is not required to be in writing, or signed and sealed by the parties, that they could bind the partnership firm in anything, and that they did in this particular, in going upon this bond by Harve Kneisley, with his brother's ratification thereafter had, and under the circumstances as detailed by the evidence, binding the partnership as surety on this bond. I find that the time of the payment of the $500 in controversy the contractor, Stoddard, did not designate to which one of these claims, the ice plant or the mining plant, it should be applied, and that the plaintiffs at the time, by express understanding with themselves, applied it to the claim of the mining plant as a credit, and so notified the contractor by mail.

"I find that before the defendant Corl paid the $2,000 to Stoddard on the second of May, that he had advised with and informed the plaintiff that he was going to pay, or was about to pay the contractor some money, and asked them to be present if they so desired, or to get an order or something of that kind, but that they directed him to go ahead and pay it to the contractor and assented to his paying the contractor in person the money without having them connected with it.

"I find that the amounts kept on their books were usually charged to the ice plant or to the mining plant in proper order, but in some cases the books are not clear as to where the lumber went. But I am satisfied from the evidence that the lumber charged for in the lien claim all went into the ice plant, and further,

that the lumber removed from cars that went to the ice plant was other lumber of plaintiffs that had simply been shipped with this ice plant lumber, and that the items of the claim sued on are correct in every particular.

"I find that after the contract was entered into that the plaintiff and Corl had an understanding that the services of the superintending architect might be dispensed with and should be dispensed with and that that was thereafter done.

"I find that there were no changes shown by this evidence in the original plans except such as were contemplated by the plans, and that this balance of $86 was mainly brought about by extra work over and above the contract, and entirely separable from the contract work.

"I hold that the bond, covering the contract, as it did, covered such minor changes as the contract itself in terms specified or contemplated.

"I hold the law to be that by going upon the bond and remaining liable thereon, as the court holds they did, the plaintiff is not allowed to recover from the defendants for a lien claim on this property, being one of the things guaranteed against by their suretyship.

"I hold that by authorizing the defendant, Corl, to pay the contractor the $2,000, which he did pay him on May second, the plaintiffs waived their right to a lien on the property to the amount of $1,000, which I find they understood was to come to them, and they were wanting out of that $2,000.

"I hold that the plaintiff, by waiving the necessity of a superintending architect and his services, waived the condition in the contract that the payments were to be only seventy-five per per cent of the work completed."

The abstracts do not show whether or not the findings were made at the request of either party to the suit. There is substantial evidence in support of each

of the findings, and though, we might be of the opinion that some of the findings are against the weight of the evidence as abstracted, still we will defer to the findings of the learned circuit judge for the reason he heard the witnesses, observed their demeanor as such and was in a much better position to pass upon their credibility and give proper weight to their evidence than are we. On the findings, the departures shown by the evidence from the stipulations in the contract and from the specifications are of no consequence since the plaintiffs assented to them, and by so doing are estopped to plead they were discharged as sureties on the bond by reason of such departures. With the plea that plaintiffs were discharged as sureties on the bond, by reason of a violation of the contract, eliminated, the case is boiled down to a single question, namely, are plaintiffs, under the facts shown, bound as sureties on the bond? This question involves two points: first, whether or not there was any consideration for the bond; second, whether or no plaintiffs are all bound by the act of Harve Kneisley in signing the firm name to the bond, and the subsequent ratification of the act by Harry Kneisley. In regard to the first point, the evidence shows the bond was not signed on the day the contract was. Defendants' evidence is that it was signed on the succeeding day and before the contract was actually delivered to Corl and Murray. Plaintiffs' evidence is that the bond was not signed by the firm name until something like a week after the contract was signed and after Corl and Murray had material for the building on the ground. Both instruments were written on the same sheet of paper; both were stamped with a United States revenue stamp. These stamps were cancelled by the following marks: "50 Fifty Cents, 4-14-1900. E. B. S. Documentary," in the same ink and by the same hand; and Corl testified that he absolutely refused to accept the contract without the bond and so informed Harve Kneisley; that

Kneisley then asked him if his firm would be acceptable security, and after making some inquiries he told Kneisley he would accept the firm as surety and thereupon Kneisley signed the firm name to the bond. Harve Kneisley testified that after Stoddard signed the contract and bond he left the bond with him and he agreed to get security on it, and when Corl told him he would accept the firm he signed the firm name to the bond. Now while this evidence shows that the execution of the contract and bond was not simultaneous, it also shows that the contract was not to become effective until the bond was executed and that it was not accepted by Corl and Murray until the bond was signed by the Kneisley firm. The bond and contract, according to the evidence, were delivered at one and the same time and took effect at one and the same time, and there is no dispute in regard to the fact that the Stoddard Company agreed to give the bond for the faithful discharge of its duties as contractors and for indemnity against liens. In these circumstances, the bond was a part of the contract, and the contract was a sufficient consideration for the bond, notwithstanding the bond may have been given after the execution of the contract, or even after the commencement of the work. [Fullerton Lumber Co. v. Calhoun, 89 Mo. App. 209.] In respect to the second point, as a general proposition, it is well settled law that on the principle of agency, the power of a partner to bind his copartners is limited to the objects and ordinary necessities of the firm. [1 Brandt on Surety and Guar., sec. 27; 22 Am. & Eng. Ency. of Law (2 Ed.), p. 144; Flanagan v. Alexander, 50 Mo. 50; Rimel v. Hayes, 83 Mo. 200; Broughton Bros. v. Sumner, 80 Mo. App. 386.] The signing of a builders bond as surety was not one of the objects of the partnership, nor an ordinary necessity to the partnership, and hence was not within the power of Harve Kneisley. However, Harry Kneisley ratified the act and is equally bound as surety with his brother. But as

stated above, there is no evidence that Mrs. E. L. Kneisley ratified the signature of the firm to the bond, or that she was even informed that it had been signed by the firm. The learned circuit judge found, and the evidence shows, that Harve and Harry Kneisley were the sole administrative agents of the partnership and transacted the business of the firm without consulting their mother. The learned judge further found that the signing of the bond was a negotiation to further the interest of the firm's business and, inferentially found, that the signing of the firm name was within the scope of the agency of Harve Kneisley. We cannot accede to this proposition, that going security on builders bonds was one of the objects of the firm, or one of the means ordinarily used by such firms to sell lumber, or that it was a necessity of the partnership. A lumber company is not formed for the purpose of inducing trade by signing its customers' bonds. Signing bonds as security is foreign to the purpose of such a company and not within the scope of its business, nor does the evidence show, or tend to show, that the firm was under a pressing necessity to secure the contract to furnish the lumber for the ice plant. Though Harve and Harry Kneisley were the sole administrative agents of the partnership, their agency was restricted solely to the objects and necessities of the partnership and, as between themselves and their mother, they were without authority to bind her to any contract or agreement outside the objects and necessities of the firm. However, it is contended by defendants that Mrs. Kneisley was a dormant partner and the other partners could bind her to a contract of the firm without her assent. Parsons says the term "dormant partner" implies both the quality of secrecy and inactivity, but that it "is often used as synonymous with unknown." Parsons on Partnership, sec. 31. George says, "A dormant partner combines in himself the characters of both the secret and the silent part-

ners." [George on Partnerships, p. 95.] We think the evidence brings Mrs. Kneisley clearly within the definition of a dormant partner. As such like any other partner she is liable on all contracts entered into on behalf of the partnership. [Story on Partnership, sec. 103; George on Partnership, p. 374.] *Inter se* the active members of the firm had no authority to bind her as a dormant partner by contracts outside the scope of the partnership. But as to third persons dealing with the ostensible partners, this limitation of authority cannot be applied, as a secret partner is not liable for the debts of the firm until discovered, he should not be allowed, by making himself known, to upset a contract made by an innocent third party with the active members of the firm. Such third person cannot be affected by the false colors held out by concealing the fact of the existence of another partner, and the contract, though outside the scope of the partnership, will be enforced against the firm as though the firm was composed only of the active members who made the contract, or ratified it after it was made. [2 Bates on Partnership, sec. 1083.] See also the opinion of Judge NAPTON in Drake v. Rogers and Shrewsberry, 6 Mo. 1. c. 320. If this were not so, the equitable rule that "where one of two innocent persons must suffer by the act of a third party, he shall suffer who has been the cause or occasion of the confidence and credit reposed in such third persons," would be reversed. The entire management of the firm's business was entrusted by Mrs. Kneisley to her sons and she permitted them to hold themselves out and to act as the sole members of the firm. In these circumstances, she cannot repudiate any contract which they made with an innocent party, in the name of the firm. This view necessarily leads to an affirmance of the judgment and makes it unnecessary to notice the assignment of errors in appellant's brief not discussed in this opinion.

The judgment is affirmed. All concur.